MOORE, J.
 

 11Keith Fuqua appeals a judgment ordering him to pay a basic child support obligation of $2,419.62 per month for his three children. For the reasons expressed, we amend and affirm.
 

 Factual Background
 

 Keith and Shelly Fuqua got married in August 1997. They had three children: Mary Taylor in 1999, Margaret Grace in 2001, and Hayes Alexander in 2006.
 

 During their marriage, Keith and Shelly appeared to enjoy an affluent life in Lincoln Parish. Keith’s parents, Rodney and Betty Fuqua, are the longtime owners of Fuqua Paper Supply LLC (“FPS”), Ru-ston’s leading supplier of paper, plastics and food service disposables. Although he was never an owner, manager or director or FPS, Keith had worked for his folks
 
 *1123
 
 since 1992. By early 2007 he was FPS’s purchasing agent, making about $6,500 per month, including salary, gasoline allowance, vehicle insurance, health insurance for his family, and tuition at private Cedar Creek School. He also had the use of a company vehicle, a 2007 Chevy Silverado crew cab 4-door truck.
 

 In addition, in the late 1990s Keith and Shelly, along with Monroe venture capitalist Frederick Huenefeld and his wife, started their own business, Fuqua Maintenance Service LLC (“FMS”), a janitorial service for local companies. By early 2007, Keith’s compensation package from FMS was $10,500 per month. Meanwhile, Shelly worked part time selling dresses for CAbi LLC, a direct sales company. Keith and Shelly bought a large, new home on a 1.5-acre tract in Creek’s Edge Subdivision, sent the ^children to Cedar Creek, and Shelly and the kids spent a lot of time at Squire Creek Country Club.
 

 For reasons not disclosed in this record, Keith left the domicile in April 2008 and filed this petition for an Art. 102 divorce and incidental matters in June 2008. The children remained with Shelly in the Creek’s Edge house. By interim order of November 2008, Keith agreed to pay the mortgages and insurance on the house; auto insurance premiums on the community’s Chevy Suburban, which Shelly retained; up to $400 a month for fuel; $750 a week allowance for Shelly; up to $160 a month for her cell phone; and once-a-week maid service provided by FMS.
 

 Keith promptly fell behind, leading Shelly to file a contempt rule. In a subsequent pleading, Keith alleged that the recent economic downturn had hit him very hard: his income from FPS (his parents’ company) had been cut 50%, business at FMS (his own company) was so diminished that he could no longer take any cash draws, and the couple was unable to pay their 2008 federal and state taxes. He added that he was doing his best to support Shelly and the kids, but Shelly’s spending was out of control.
 
 [1]
 
 In March 2009, the court declined to hold Keith in contempt, but ordered him to pay a deficiency of $1,924 and an attorney fee of $750.
 

 In early August 2009, Keith and Shelly filed a joint motion to partition their stock in FMS. The court approved this, enabling them to sell their respective 25% undivided shares to their business associates, the Huenefelds, for $175,000 each. Shelly testified that she banked her money, |swhile Keith directed Huenefeld to make his check payable to his father, Rodney Fu-qua. Keith immediately used over $121,000 of the proceeds to repay his father for various loans and over $27,000 to buy the company truck he had been using since the separation. This left him only about $26,000 from the sale of his interest in FMS.
 

 Synopsis of Testimony
 

 At the hearing on the rule to fix child support,
 
 [2]
 
 Keith testified that since he signed the interim order, his business had totally collapsed. Since early 2009, his salary from FPS had been reduced to $1,625 a month gross, and he named several former FPS clients who had dropped their service. He admitted that FPS still paid the kids’ health insurance premiums, his $5,000 a year medical savings account and a gas allowance, and his parents were still paying the kids’ Cedar Creek tuition. He also admitted he was renting a house
 
 *1124
 
 from his parents at $1,800 a month. He estimated that all told, his income from FPS was slightly under $2,000 a month. He also testified that he had recently received one-time backpay from FMS of $6,300.
 

 Keith explained that he was currently making ends meet only by exhausting the proceeds of the FMS sale. From that lump sum, he had paid his father for loans and advances which he itemized at $121,361.75, even though there were no notes or papers to document these debts. He also insisted that he paid his father fair market value (Kelley Blue Book) for the Silverado, and then one-half of the Cedar Creek tuition, leaving him only about $20,000. He added that the business climate was so poor that he ^expected to leave FPS, and named several local businesses where he had submitted job applications, but thus far he had received only one return call. Finally, he testified he now wants the kids to go to public school, Glen View Elementary, that he was trying to sell the house in Creek’s Edge, despite Shelly’s urgent request to keep it, and that he needed about $3,000 a month to live “without frills.” He argued that based on the parties’ finances, his child support should be $510 a month.
 

 Rodney Fuqua corroborated much of Keith’s testimony, adding that he was now 71 years old and intended to retire, although he had taken no steps to sell FPS. Most of all, he testified, he could not continue loaning Keith money indefinitely.
 

 Shelly testified that during the marriage, Keith handled all the finances, so she had no idea how he made his money. She admitted she earned only about $1,000 a month selling dresses, but she could not take a full-time job because she needed to be at home with the children. She assumed that no matter what, Keith’s folks would continue paying the kids’ Cedar Creek tuition, and admitted she had told someone that their house was not on the market.
 

 Dr. Sally Thigpen, the court-appointed child psychologist, testified (among other things) that when she' first interviewed them, Keith and Shelly said they would pay one-half of the kids’ Cedar Creek tuition.
 

 Action of the Trial Court
 

 By written reasons, the district court set out the background facts, noting that because the prior order was by stipulation and without prejudice, ^neither party had to prove a change of circumstances; the only issue was child support under La. R.S. 9:315. The court accepted that until about February 2009, Keith’s annual compensation package from FPS and FMS totaled $17,000 a month; from February through July 2009, it dropped to $12,175 a month; in August, he received cash of $175,000 for his interest in FMS; and since then, he claimed to be earning only $1,625 a month from FPS. The court rejected Keith’s claim that $121,244 of the capital payment “was properly paid to his father,” as there was no documentation, many of the debts appeared to be community obligations or gifts, and many of the claimed expenses were “inflated.” The court opined that “the funds invested at 6% per annum will generate interest income of $10,500 per year, or a total of $875 per month,” which it imputed to both parties’ incomes. The court further found that Keith’s potential income should be imputed to him under R.S. 9:315 C(5)(b), citing these reasons:
 

 (1) Keith has demonstrated an ability to engage in lucrative entrepreneurial ventures; (2) Keith shows rental expenses of $1,800 per month, which suggests to the court that he anticipates earning significant funds to support an upscale lifestyle; (3) he has a history of
 
 *1125
 
 earnings in excess of $200,000 on an annual basis.
 

 The court found that Keith’s earning capacity was $125,000 a year, to which it added the 6% interest on $175,000, for a total of $135,500 a year, or $11,290 a month. It fixed Shelly’s income at $1,000 a month from CAbi plus the 6% on the $175,000, or $1,875 a month. According to the court’s worksheet calculation, the basic support obligation was $2,489.80, of which Keith’s 85.76% share was $2,419.62. A monthly premium of $331.59 directly to the insurer to maintain the children’s health and hospitalization | r,policy was included in the sum.
 

 Keith has appealed, raising six assignments of error.
 

 Discussion: Income Potential
 

 By four of his assignments of error, Keith urges the court erred in imputing an earning potential of $125,000 a year. He contends that contrary to R.S. 9:315 C(5)(b), the court made no specific finding that he was underemployed or unemployed, did not propose that such a finding was necessary to impute income, and did not find he was at fault or guilty of neglect in causing his current condition. He argues that a finding of voluntary underemployment was reversed in
 
 Luplow v. Luplow,
 
 41,021 (La.App. 2 Cir. 2/28/06), 924 So.2d 1135, on the rationale that the obli-gor spouse was in good faith, and that the same rationale applies here. By his second assignment, Keith urges the court erred in finding that he had a demonstrated ability to engage in lucrative entrepreneurial ventures; he submits that in reality he was never anything more than his dad’s gofer
 
 [3]
 
 at FPS. By his fourth assignment, Keith urges the court erred in finding that his long-established rental expense of $1,800 a month suggested in any way that he anticipated earning significant funds in the future; he shows that he rented this house months before his income tanked and it simply does not equate with an expectation of enhanced income. By his fifth assignment, he urges the court erred in relying on his earning history. He argues that voluntary underemployment is a question of good faith of the obligor spouse,
 
 Arrington v. Arrington,
 
 41,012 (La.App. 2 Cir. 4/26/06), 930 So.2d 1068, and nothing in the record shows that he was in bad faith or at fault in the business downturn that ruined his finances.
 

 Shelly responds that the court’s finding that a parent was in good or bad faith in reducing his income is factual and subject only to manifest error review.
 
 Durfee v. Durfee,
 
 44,281 (La.App. 2 Cir. 5/13/09), 12 So.3d 984. She submits that the court was not plainly wrong to find that Keith previously made over $200,000 a year at FPS and FMS, or to use this as a gauge of his income potential. She also argues that even though they sold their interest in FMS, Keith did not show that he could no longer work there at a significant salary; at $78,000 a year, Keith was far from a gofer at FPS; and FMS was successful, even if it was only a janitorial service. Further, the timing of Keith’s job search, and the immediate diversion to his father of most of the proceeds of the sale of FMS, strongly support the court’s finding of a bad faith effort to avoid his support obligation. Finally, she contends the court was entitled to treat the $1,800 a month rent house as proof of some financial means on Keith’s part. She concludes that the court did not abuse its discretion in finding him voluntarily underemployed and fixing his income potential at $125,000 a year.
 

 
 *1126
 
 If a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of his or her income earning potential, unless the party is physically or mentally incapacitated, or is caring for a child of the parties under the age of five years. La. R.S. 9:315.11 A. Income includes potential income, if a party is voluntarily unemployed or underemployed. La. R.S. 9:315 C(5)(b). A party is not adeemed voluntarily unemployed or underemployed if he or she is absolutely unemployable or incapable of being employed, or if the unemployment or underemployment results through no fault or neglect of the party.
 
 Id.
 

 Voluntary underemployment is a question of good faith of the obligor parent.
 
 Durfee v. Durfee, supra,
 
 and citations therein. Whether the obligor is in good faith in reducing his or her income is a factual determination which will not be disturbed on appeal absent an abuse of the trial court’s wide discretion.
 
 Id.
 
 The trial court also has wide discretion in resolving factual issues.
 
 Id.
 

 There is no merit to Keith’s threshold claim that the district court failed to make a specific finding of voluntary underemployment or to state that such a finding was needed to impute his potential income. The court expressly found “an effort by Keith to impoverish himself to reduce his child support obligation” and that “Keith’s potential income should be imputed to him pursuant to R.S. 9:315 C(5)(b).” The only issue is whether the court abused its discretion in applying the statute to this record.
 

 The evidence was admittedly conflicting. This court is fully aware of the national economic downturn that sharply affected businesses in north Louisiana in 2008 and 2009, and continues to do so; the downturn lends considerable weight to Keith’s claim of diminished income at FPS and FMS irrespective of his individual performance. Also, his lucrative post in a small, family-owned business may well be hard to replicate in the outside, corporate world. Against these circumstances, however, is the fact that Keith and Shelly (with the Huenefelds) formed their own company which, Reven in the financial downturn, was worth $700,000; this shows no mean entrepreneurial ability. The way Keith handled the proceeds of the sale of FMS, even on the impassive record, raises considerable questions as to his good faith in that no debts to his father were documented and many appear to be gifts or community obligations. This case is not about Rodney Fuqua’s business judgment, but given the family relationship, the decision to slash Keith’s salary while handling others differently could well have been a mutual agreement intended to minimize Keith’s income. Contrary to Keith’s argument, his continued $1,800 house rent and other expenses are inconsistent with a claimed monthly income of $1,956.
 
 Savage v. Savage,
 
 36,138 (La.App. 2 Cir. 6/12/02), 821 So.2d 603.
 

 On full review, we cannot say the district court was plainly wrong in finding Keith voluntarily underemployed and in imputing his potential income under R.S. 9:315 C(5)(b). The figure imputed, $125,000, admittedly strains the upper limit of the district court’s discretion. This court sees both parties living far beyond their collective means and notes that the award is subject to modification upon proof of a material change in circumstances. La. R.S. 9:311 A(l);
 
 Strange v. Strange,
 
 42,318 (La.App. 2 Cir. 6/20/07), 960 So.2d 1223. On the instant record, however, we cannot say the imputation of $125,000 is an abuse of the court’s vast discretion. These assignments lack merit.
 

 Interest Income
 

 By his third assignment of error, Keith urges the district court erred in
 
 *1127
 
 imputing income to each party based on 6% interest on the $175,000 each | inreceived from the sale of FMS. Keith contends there was absolutely no evidence to support this interest rate; he suggests that the advertised rate on a $100,000 CD is under 1%, and savings accounts are even less than that. By his sixth assignment, he urges the court erred in its calculation of the child support obligation worksheet.
 

 Shelly responds that Keith offered no evidence regarding prevailing interest rates and failed to identify the financial institutions he consulted regarding those rates. She concedes that a CD or savings account would not pay 6%, but suggests that “investing in stock or in mutual funds would accrue a much higher interest” and thus the court did not abuse its discretion in imputing 6%.
 

 There is no record evidence to support the court’s finding that the parties can earn 6% interest on a principal of $175,000. With this total absence of evidence, the imputation of $10,500 a year to both parties is plainly wrong and manifestly erroneous. The prevailing interest rates are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, and hence are subject to judicial notice. La. C.E. art. 902 B(2);
 
 Southern Bell Tel v. Louisiana Public Serv. Comm’n,
 
 187 La. 137, 174 So. 180 (1937). As in
 
 Southern Bell,
 
 this court takes judicial notice that interest rates now paid by banks, thrifts and credit unions are nearly negligible. The record is equally void of evidence that the parties are sophisticated investors who could place what is perhaps their largest asset in high-risk securities. This portion 'of the judgment is reversed.
 

 In With this conclusion, we also find merit in Keith’s sixth assignment of error. We must recalculate the obligation without imputing the interest as income. Shelly’s monthly income of $1,000 plus Keith’s of $10,416.67 yields a combined monthly income of $11,416.67. Of this total, Keith’s share is 91.24%. According to the table in R.S. 9:315.19, the basic support obligation for three children at this income level is $2,285. Keith’s share of the basic support is therefore $2,084.85. The judgment is amended accordingly.
 

 Conclusion
 

 For the reasons expressed, we amend the judgment to provide that Keith Fuqua shall pay child support in the full sum of Two Thousand, Eighty-Four and 85/100 ($2,084.85) dollars per month, of which Three Hundred, Thirty-One and 59/100 ($331.59) dollars is to be paid to the health insurance company to maintain the children’s health and hospitalization. In all other respects, the judgment is affirmed.
 

 Costs are assessed one-half to each party.
 

 AMENDED AND AFFIRMED.
 

 [1]
 

 . Keith attached receipts for frequent outings at Squire Creek Country Club and prodigious charges at drugstores, lending some weight to this assertion.
 

 [2]
 

 . The district court limited each side to 1 hour and 15 minutes to present its case.
 

 [3]
 

 . The word is misspelled in both briefs as "gopher,” the word for a burrowing rodent.