MOORE, J.
12Rodney Keith Fuqua (“Keith”) appeals a judgment granting his former wife Shelly Fuqua’s petition to relocate the couple’s three minor children from Lincoln Parish to Madison County, Mississippi. For the reasons expressed, we affirm.

Factual Background

Keith and Shelly got married in 1997. They had three children: Mary Taylor in 1999, Margaret (“Maggie”) in 2001, and Hayes in 2006. For reasons not disclosed in the record, Keith left the marital home, a large house on a 1.5-acre lot in Creek’s Edge Subdivision in Lincoln Parish, and moved into a rental house owned by his *536 parents, Rodney and Betty Fuqua (sometimes referred to herein as “the Fuquas”). The children remained with Shelly at the Creek’s Edge house, but also spent generous amounts of time with their grandparents, the Fuquas.
Keith filed for an Art. 102 divorce and incidental matters in June 2008. By the parties’ agreement, the court appointed Dr. Sally Thigpen to | .^conduct a custody evaluation. Keith also agreed to pay the two mortgages on the Creek’s Edge house (about $3,500 a month), insurance, and other stated expenses.
Keith’s stream of income, however, ran almost dry in the economic downturn, dropping from over $17,000 a month in 2007 to about $2,000 a month by early 2009.[1] He fell behind in his agreed payments, and Shelly filed a contempt rule; after a hearing in January 2009, the court ordered him to pay $1,924 in arrears.
On March 9, the parties stipulated that they would accept Dr. Thigpen’s “Plan 4,” which basically split custodial time each week but alternated Saturday nights between the parties.
At trial in August 2009, Shelly did not contest the Art. 102 divorce but pressed a claim for child support. The court found Keith voluntarily underemployed and ordered him to pay support of $2,419 a month. He appealed; this court affirmed the finding of voluntary underemployment but reduced the amount to $2,084 to reflect a more realistic projection of interest income.
On January 4, 2010, Shelly filed another contempt rule, alleging Keith was behind in child support and in the home mortgages, resulting in default. By this time, Keith had left the rent house and moved in with his parents. On |4January 19, Shelly advised him by certified letter that she wanted to relocate the children with her to Madison, a suburb of Jackson, Mississippi, where her flaneé, Tom Welch, lives.
Meanwhile, Keith’s father, Rodney, had formed an LLC called Creeks’ Edge Properties. Rodney contacted the second mortgagee on the Creek’s Edge house, Community Trust Bank, and bought the second mortgage, which was in default. He transferred this paper to his LLC, which obtained a writ of seizure and sale on the house. He then bought the property at sheriffs sale. On February 21 or 22, the LLC’s attorney served Shelly with notice to vacate the property by February 27. Shelly did so, taking the children to a new subdivision in Monroe, about 30 miles away.
Keith did not respond to Shelly’s notice of proposed relocation, so on February 22 she filed the instant petition for relocation. She alleged that she and Tom Welch planned to get married on June 5, and wanted to move the children after they finished the spring semester at their private school, Cedar Creek. She added that Keith had repeatedly stated he could no longer afford to send them to Cedar Creek, the Fuquas had orchestrated the scheme to get her evicted from the Creek’s Edge house, and because of “continuous ^conflicts and problems” with exercising custody, the children’s best interest would be served by the move.
Keith answered that the house was foreclosed on because of nonpayment of the mortgages; Shelly was the “only party that has been obstreperous and contentious”; and all the children’s connections (especially with the Fuquas) were in Lincoln Parish. He argued that it was not in *537 the children’s best interest to move, even if it was in Shelly’s.

Synopsis of Trial Testimony

The matter proceeded to a two-day trial in April 2010.[2] It was generally agreed that both parties loved the children dearly and had been very active in their upbringing. However, each offered a litany of incidents to prove the other’s poor parenting. Shelly complained that when Keith had the children, they actually stayed with the Fuquas, who would intercept or block her phone messages, and Betty often disparaged her to the girls; Rodney’s scheme to get her out of the Creek’s Edge house had been particularly cruel; Keith had never been current with support; in emails, Keith threatened to prolong the litigation. She also testified that even though her fiancé did not make a lavish living, he was earning at least twice as much as Keith claimed to earn.
| fiTom Welch testified that he had met Shelly’s three children around Christmas 2008, and they were a “joy.” He also testified that he has split custody of a 12-year-old daughter from his previous marriage and felt that the public schools in Madison County are excellent.
Keith testified that sometimes Shelly left Hayes in his room, crying for 30 to 45 minutes, even though the child would take a toy and pummel the door to the point of breaking off the doorknob; once, at Creek’s Edge, he fell in the nearby creek while Shelly was inside; once, in Monroe, Keith’s attorney saw the boy on a trike near the front gate of the subdivision, unattended; one of the girls has a mild learning disability which is under control because of a tutor, Mrs. Allen, in Ruston; Shelly often sleeps too late to fix the kids a hot breakfast, so they have to eat fruit and microwaved pastry in the car while riding to Cedar Creek; Shelly tends to drink a lot; even though the family had been attending First Baptist Church of Ruston for several years, Shelly candidly told him she would. start attending Tom’s Episcopal church. The pastor of First Baptist of Ruston also testified to confirm the wholesomeness of their church home.
Dr. Thigpen, the court-appointed expert, testified that she had been in the case since September 2008 and had interviewed all the involved persons. She found Keith confrontational, and even though the girls said they wanted |7to stay in Ruston, she strongly suspected that Keith and the Fu-quas were coaching them. She used a relocation risk assessment model from Family Court Review;[3] and described in detail each step of the process. For instance, the move is not a financial necessity but would be a financial benefit for Shelly and the children; the 2]é-hour distance from Ruston to Madison would actually ease the situation between the parents, and remove the “negative influence” of the Fuquas; the girls are of an age that they can easily adjust to a new environment, and the boy could frequently talk to his dad by Skype, a software for making long-distance voice calls over the Internet; and according to her online research, the public schools in Madison County are very highly rated. She conceded that her assessment model was not scientifically validated, Cedar Creek is an above-average school, the children have never lived in the Jackson area, and there is uncertainty in *538 any move. However, she felt the proposed relocation was more beneficial than detrimental, and recommended approving the request.
After an argument with Dr. Thigpen, Keith had gone to Monroe and hired his own child psychologist, Dr. E.H. Baker, who interviewed the kids, Keith and the Fuquas, but not Shelly. (He did not even advise Shelly or Dr. Thigpen that Keith had hired him.) He sharply criticized Dr. Thigpen’s risk assessment, but admitted that in many ways it tracked the factors of ^Louisiana’s relocation statute, R.S. 9:355.12. He thought that stability was the most important factor, and that Keith, the Fuquas, Cedar Creek School and First Baptist of Ruston could best provide it; also, the girls were adamantly against the move. He was skeptical of the home Shelly could provide in Madison, given Tom’s limited income (about $50,000 a year) and small house (1,700 square feet); he did not believe a three-year-old could have meaningful interaction with his dad on Skype; and he questioned the stability of Shelly and Tom’s relationship, as they met on eHarmony.com. Finally, he thought that Dr. Thigpen had dwelt too much on Shelly’s best interest instead of the children’s. He concluded that the move would be bad for them and strongly urged the court to keep them in Ruston.

Action of the District Court

After keeping the case under advisement for over a month, the court rendered oral reasons. It called Keith’s position “disingenuous” after he “acquiesced and supported the eviction of Shelly and the children from the home in Ruston[.]” It accepted the conclusions of Dr. Thigpen, which it found similar to its own, especially her view that the present situation was “toxic for these children.” The current shared custody had been a “complete disaster” owing to a “total breakdown in the desire or ability of the adults in this situation to relate to one another in a healthy or meaningful way,” and 19Keith had been most culpable in undermining Shelly’s relationship with the children. Not all the details of the proposed move were completely resolved, but the court was “impressed” with Mr. Welch and found that the home, schools and church in Madison were more than adequate, and only 120 miles farther away than their current home in Monroe. The court therefore granted the petition to relocate, subject to visitation on alternating weekends, all Thanksgivings, springs breaks and Father’s Days, and over the summer except for alternating weekends.
Keith has appealed.

Applicable Law

A parent wishing to change the principal residence of the child must notify the other parent of the proposed relocation by registered or certified mail at least 60 days before the proposed move. La. R.S. 9:355.4 A. The relocating parent has the burden of proving that the proposed relocation is (1) made in good faith and (2) in the best interest of the child. La. R.S. 9:355.13. In reaching a decision regarding a proposed relocation, the court is required to consider the following factors listed in R.S. 9:355.12 A:
(1) The nature, quality, extent of involvement, and duration of the child’s relationship with the parent proposing to relocate and with the nonrelocating parent, siblings, and other significant persons in the child’s life.
| in(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development, taking into consideration any special needs of the child.
(3) The feasibility of preserving a good relationship between the nonrelo- *539 eating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
(4) The child’s preference, taking into consideration the age and maturity of the child.
(5) Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the nonrelocating party.
(6) Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but not limited to financial or emotional benefit or educational opportunity.
(7) The reasons of each parent for seeking or opposing the relocation.
(8) The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.
(9) The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation, including child support, spousal support, and community property obligations.
(10) The feasibility of a relocation by the objecting parent.
In(ll) Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.
(12) Any other factors affecting the best interest of the child.
The statute does not direct the court to give preferential consideration to any certain factors. Curole v. Curole, 2002-1891 (La.10/15/02), 828 So.2d 1094. In ruling on a relocation request, the trial court may give whatever weight it deems appropriate to the testimony of any and all witnesses, including that of experts. Id. The trial court’s determination to grant or deny a relocation is entitled to great weight and will not be overturned on appeal absent a clear showing of abuse of discretion. Id.; Payne v. Payne, 41,049 (La.App. 2 Cir. 5/19/06), 930 So.2d 1181, writ denied, 2006-1871 (La.8/9/06), 935 So.2d 130.

Discussion

By his sole assignment of error, Keith urges the district court was clearly wrong and abused its discretion in allowing the relocation. He contends that the court only stated -that it considered the factors of R.S. 9:355.12, but did not set forth its analysis, totally failing to consider them. In support, Keith quotes copiously from the trial transcript, especially the 112testimony of his own expert, Dr. Baker, and argues that Dr. Thigpen’s risk assessment model was nonstandard, invalid and unreliable. Although he urges that every statutory factor weighs against the relocation, he particularly contends that the court erred in (1) placing Shelly’s best interest over the children’s, (2) concluding that the relocation would reduce the conflict between the parties, and (3) disregarding the proven stability that can be maintained only by keeping the children in Ruston with Keith and the Fuquas.
Shelly responds that the court did not abuse its discretion in resolving the disputed facts and expert opinions. Curole v. Curole, supra. She shows that the weight given to expert opinion depends not only on the professional qualifications and expertise of the expert, but also the facts on which it is based. Verret v. Verret, 34,982 (La.App. 2 Cir. 5/9/01), 786 So.2d 944. She submits that the court *540 was justified in disregarding Dr. Baker’s recommendation because he never interviewed her or attempted to get her version of the household incidents that he deemed so incriminating. She contends that Keith’s persistent failure to pay child support, the Fuquas’ apparent attempts to influence the children against her, and them stratagem to evict her from the house on very short notice, all reinforce the trial court’s finding of a “toxic situation” and support the judgment.
 I^At the outset, we find no basis to disturb the district court’s decision to accept the opinion of Dr. Thigpen over that of Dr. Baker. As noted, the weight to be given to expert testimony depends on the facts on which it is based as well as the professional qualifications and expertise of the expert. Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229; Verret v. Verret, supra. Crucially, Dr. Baker did not interview Shelly, and his view of many disputed incidents was clearly informed only by Keith and the Fuquas; by contrast, Dr. Thigpen interviewed all the persons involved, and even on the cold record her analysis is more comprehensive. Also, Keith has not shown that Dr. Thigpen’s risk assessment model deviated in any material way from R.S. 9:355.12 and 355.13.[4] Finally, the court had previously appointed Dr. Thigpen, by the parties’ agreement, to perform an evaluation; the record shows no compelling reason to disregard her report. Her only failing was her inability to resolve Keith’s confrontational conduct. This portion of the argument lacks merit.
On the merits, Keith correctly shows that the court did not itemize the factors of R.S. 9:355.12 in checklist form. However, the court’s careful and insightful summary of the facts confirms that it fully considered the statute. No single factor is entitled to preferential consideration. Curole v. Curole, supra; Payne v. Payne, supra. If stability of the children’s environment were the paramount factor, as Keith argues, the statute would be almost meaningless, as relocation is virtually always disruptive. The issue is whether the proposed relocation is made in good faith and in the best interest of the children. La. R.S. 9:355.13.
We will not belabor the litany of household incidents catalogued in Keith’s brief; the parties presented divergent accounts of each, and the district court was entirely within its discretion to resolve them in the manner it deemed appropriate. The court correctly noted that the children’s financial circumstances stood to improve with the move, given Keith’s current economic circumstances and inconsistent history of paying spousal and child support. The court was not plainly wrong to disregard the two girls’ stated preference to remain in Ruston, given the prompting noted by Dr. Thigpen and the totality of the circumstances. Finally, the court did not abuse its discretion in viewing the children’s current environment in Ruston as “toxic.” It is true, of course, that Shelly and the children had to leave the Creek’s Edge house because of failure to pay the mortgages; however, there was something especially malignant about the scheme *541 whereby Keith’s father could personally superintend their eviction. The court specifically |1sfound that Keith “acquiesced and supported” this action; as elsewhere, we perceive no abuse of discretion. This portion of the argument lacks merit.

Conclusion

For the reasons expressed, the judgment approving the relocation is affirmed. Costs are to be paid by Rodney Keith Fuqua.
AFFIRMED.

. The details of the parties' finances are set out in the court's prior opinion in Fuqua v. Fuqua, 45,555 (La.App. 2 Cir. 9/22/10), 47 So.3d 1121, and not reiterated here.

. The district court imposed a six-hour time limit on each side’s presentation.

. William G. Austin, Relocation, Research, and Forensic Evaluation, Part I: Effects of Residential Mobility on Children of Divorce, 46 Family Ct. Rev. 137 (January 2008); Part II: Research in Support of the Relocation Risk Assessment Model, 46 Family Ct. Rev. 347 (April 2008).

. The relocation risk assessment lists eight factors: (1) age of the child; (2) geographical distance and travel time; (3) psychological stability of the relocating parent and parenting effectiveness of both parents; (4) individual resources/individual differences in the child temperament/special developmental needs; (5) involvement by the nonresidential parent; (6) gatekeeping and support for the other parent-child relationship; (7) interparental conflict and domestic violence; and (8) recentness of marital separation. Austin, op. cit., Part II. Dr. Thigpen cross-referenced each of these factors to a subsection of R.S. 9:355.12 A.