Judgment rendered March 1, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,945-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                         Plaintiff-Appellee

versus

CEDRIQUZE DAITONIA                         Defendant-Appellant
JOHNSON

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2021-NS-033573

Honorable Clarence W. Manning, Judge

* * * * *

CUMMINS AND FITTS, LLC                     Counsel for Appellant
By: Daniel C. Cummins
    Jessica Leigh Fitts
    Kay S. Rector

ASHLEY L. SMITH                            Counsel for Appellee
DAVID F. VERLANDER
Assistant District Attorneys

* * * * *

Before COX, THOMPSON, and ROBINSON, JJ.

**COX, J.**

This civil appeal arises from the Fourth Judicial District Court, Parish of Ouachita, Louisiana. The appellant, Cedriquze Johnson ("Johnson"), appeals from a final judgment setting his child support payments at $983.70 per month. For the foregoing reasons, we reverse the trial court's judgment in part and affirm in part.

## STATEMENT OF FACTS

Johnson and Matila Adams ("Adams") had one minor child, C.J., who was born on December 1, 2016. The pair never married and separated a few years after C.J. was born. On January 20, 2021, counsel for the State of Louisiana (the "State") filed a rule for child and medical support against Johnson in accordance with the provisions of La. R.S. 46:236.1 on behalf of the mother. On July 2, 2021, a hearing was held to set child support, wherein Adams testified that she lived in Shreveport and worked as a payroll coordinator for LSU Health Shreveport, earning a monthly income of $3,380.41.

On cross-examination, Johnson testified that he resided in Monroe, was unemployed, and received unemployment benefits that ended sometime in January 2021. When asked if he had any other source of income, Johnson testified that he was in the process of receiving his construction license and that he used to own several businesses, but the Covid-19 pandemic stopped operations. Johnson then informed the trial court that he has another child in New Orleans that receives $176 in monthly support. At the close of the

hearing, Johnson was ordered to pay $190 in support[1] for C.J., and a review hearing was ordered to reassess Johnson's income.

The review hearing commenced on November 19, 2021. Johnson testified that he still resides in Monroe and that he owns a home there. He stated that he pays bills and other utilities with money he earns "here and there," and by "hustling." Johnson testified that he was still unemployed and had been since his businesses shut down in 2019. He stated that he attempted to reopen his businesses[2] in 2020, but was unable to successfully do so because of the pandemic. Johnson testified that he was in the process of finding work as a recruiter for Sports Marketing Agency, an agency in Florida that scouts athletes for the National Basketball Association ("NBA"), but alluded to a pending lawsuit and a "gag order"[3] which prevented him working and discussing the matter.

The State then questioned Johnson about his bank accounts. Johnson explained that he had two accounts at Hancock Whitney, one of which was in the negative, and the other had $6,956, which belonged to one of his businesses, CED Johnson Investments, LLC. Johnson testified that he did

---

[1] From the obligation worksheet provided in the record, it appears that the hearing officer imputed an interim earning capacity or income of $1,257 for Johnson in calculating support. No objection was filed to the hearing officer's recommendation.

Johnson was also ordered to pay an additional 5% statutory fee of $9.50, for a total of $195.50 in monthly child support for C.J., and cash medical support in the amount of $10.00, plus an additional 5% statutory fee of $0.50, for a total of 10.50, effective July 1, 2021.

[2] Johnson explained that he had two businesses, which included a uniform store called Uniforms We Trust, which was contracted with a school and closed in 2019; and a hair supply store called Wholesale Hair Guy, which also closed in 2019. Johnson later testified that he owned two other businesses, CED Johnson Investments, LLC, and Perfect and Perfection Global Marketing, LLC.

[3] Although Johnson indicated that he was under a "gag order" not to disclose any information about the lawsuit with the NBA, he did not produce any documentation to that effect.

not have exclusive control of those funds and needed permission from his

business partners to access the money. At the close of testimony, the trial

court imputed $100,000 as Johnson's annual income and modified monthly

child support from $190 to $937. In its reasoning, the trial court provided:

> . . . So, Hearing Officer Green heard this in July, and she
> accepted [Johnson's] testimony that he was out of money and
> out of unemployment. She set the review basically to see if he
> was—if his businesses were up and running again. He's
> testified today that they're not. That he had multiple businesses
> but sounds like most of it was based around sports or else they
> were just stores like the store selling hair. He had a store
> selling uniforms that he said he had to close when the schools
> quit playing ball. He had a store selling hair that [he] had to
> close when the Chinese imports dried up. All that is kind of
> coming back at the moment. I'm interested in the business
> partnership he had or whatever the LLC partnership whatever
> with [Gina] Ford in Miami recruiting for the NBA for twelve
> seasons, Sports Marketing. It says at one point he is going
> through a multi-[million] dollar court case and then he says he
> has a gag order, and he can't talk about it. He's got to leave
> early to catch a plane. I believe I was told back to Miami. That
> he says he paid for with points.
>
> Says he can't remember how he pays utilities at his house. That
> he hustles here and there. Found an investment company with
> some money at Hancock Whitney according to the State. At
> first, he said he was in the negative and then he said it's his—he
> can't withdraw money and then he said it's about to close. At
> one point [Johnson] said he buys houses. So, look obviously
> you're not credible. You're not being truthful. In terms of this
> business in Miami, it's just hard to speculate. Louisiana
> actually has a category for scouts of about fifty-eight
> thousand—that's almost certainly grossly low for what you're
> doing. For comparison, if I use the scout category income,
> you'd be paying about six fifty a month, but we've also got the
> stores. We've got the buying the houses and I don't—I don't
> think all of that is gone. . .

Johnson refused to sign the judgment and payor designation form, was

held in contempt and was ordered to return for a revocation hearing that

same day. At the hearing, the judge reviewed the ruling on the matter, and

ordered Johnson to sign the judgment.[4]  Thereafter, Johnson filed an objection to the November 19 2021, ruling, and a rehearing on the matter was reset for March 8, 2022.

During the rehearing, Johnson testified that he still resided in Monroe,[5] was unemployed, but later stated that he worked part-time at a bingo hall, earning approximately $10 an hour, but did not have a steady source of income.  Johnson stated that before his lawsuit with a player he previously recruited, Zion Williamson ("Williamson"), he primarily worked as a scout for the NBA, where he would recruit players and sign "sports marketing bills, like shoe deals, Nike deals, Puma deals, Gatorade, [and] Powerade," earning approximately $1,000 to $5,000, depending on the player he recruited.  However, Johnson testified that since the lawsuit, he struggled to find work, and in an attempt to recruit players again, he flew to California.

When asked how he funded a flight to California only two days prior to the hearing, Johnson explained that the parent of a child he was asked to potentially recruit, market, or brand, paid for his flight and allowed Johnson to stay in the family's home.[6]  The State then introduced two posts Johnson made while in California: a status that provided, "[m]eeting went well.  Got an invite to Donda Academy Homecoming tonight.  This company Facebook was established in 2019, Perfect and Perfection Global Marketing Agency,"

---

[4] The presiding judge over the revocation hearing disclosed that he knew Johnson and noted that if Johnson should take an appeal, he would recuse himself from the matter.

[5] The State introduced Johnson's Facebook page into evidence, which indicated Johnson resided in Orlando, Florida.  Johnson testified that he lived in Orlando at one point, renting a condo, but that he currently resides in Monroe.

[6] Although Johnson indicated that he could produce text messages attesting to this information, he failed to introduce those messages.

and a copy of a video showing Johnson at a basketball game. In response, Johnson stated that while in California, he happened to be invited to an event associated with Kanye West's private school,[7] and that the family of the player he stayed with gifted him with floor tickets to a Los Angeles Lakers and Clippers game.

In addressing Johnson's lifestyle, income, and employment, the State introduced several posts from Johnson's various social media accounts into evidence. Regarding Johnson's lifestyle,[8] the State introduced the following:

- **October 3, 2021**: A picture of Johnson at a Saints game, captioned: "I need this break. Let's go Saints."
- **November 7, 2021**: A post of Johnson at another Saints game.
- **November 12, 2021:** A post of Johnson attending a basketball game at Louisiana State University ("LSU"), captioned: "It's about that time again. . . Here I come [a]thletes."
- **November 13, 2021:** A post of Johnson attending a basketball game at Southern University and A&M College, captioned: "[o]n this recruiting trail[.]"

In response, Johnson testified that attorney Jacqueline Scott gave him tickets to both Saints games and paid for his hotel room as a birthday gift. He then explained that because of his connections, LeBrent Walker, the assistant basketball coach for LSU, was able to give him tickets to the game. Although Johnson testified that he attended the latter games for personal entertainment, he indicated that if he noticed a potential client, he would

---

[7] It is not clear from the record whether West personally invited Johnson to the event or if a member of West's team invited him, but he indicated that Kanye West knows his name and that he met West approximately 15 years ago.

[8] The State also introduced several pictures of Johnson with various celebrities and socialites, including Michael Jordan; NBA Commissioner Adam Silver; NBA players Zion Williamson and Blake Griffin; and Jay-Z.

have pursued it.[9] Specifically, he stated, "[a]nytime I go to a game, it could be through work, you know. So, if I go to a high school game and I see a player, I'm going to try and talk to the parents or something like that or do something to try to, you know, get some kind of lead way and try to make it happen. . ."

Regarding Johnson's income and employment,[10] the State introduced the following:

- **March 2020**: A picture of a marijuana farm, captioned: "This plant completely changed my life. I had some horrible moments in my life dealing with this plant. I had some great moments in my life with this plant, but on this day this plant will change my life. Thank you for this opportunity[,]" and "It on now. Cannabis plant. Just partnered with the plug. God is awesome."
- **January 21, 2021**: A post which provided: "Back at it. First day back at work."
- **August 9, 2021**: A post which provided, in pertinent part: "After all this excitement, coming back to the NBA. . ."
- **October 19, 2021**: A post which provided: "So, I'm paying drivers two hundred dollars ($200) a day in New Orleans. Paid once a week. I can't find no one on Facebook. How the [sic] you guys living and make it right?"
- **November 12, 2021**: A post which mentioned a job alert for Cracker Barrell.[11]

---

[9] Although Johnson indicated that he attended the LSU game for entertainment, he later testified that he texted LeBrent Walker about the game, inquiring about a seven-foot-tall player. We further note that no text messages were ever produced confirming that Johnson was gifted the tickets to the LSU game.

[10] The State also introduced a post from May 2019, which provided, in part, "climbing my way up." Johnson stated that this post was made before his lawsuit against Williamson gained traction and that shortly after, he "lost everything."

[11] Johnson stated that he helped a friend advertise her business because of his large social media platform. He testified that while he was not working during this time, he did not want to apply for this job because it wasn't enough money and he wanted to continue working as a recruiter.

The State also mentioned a similar post Johnson made, advertising business for a woman selling balloon arrangements. Johnson again stated that he uses his platform as a means to help others advertise their services.

To this, Johnson testified that because he has a large social media presence, he is often asked to advertise or promote business ventures, which is why he made the March 2020 and October 19, 2021, posts. With respect to the March 2020 post, Johnson explained that he attempted to form a partnership with this company and that he was asked to "market their brand" and have different athletes sponsor them. Likewise, Johnson testified that he made the October 2021 post in an attempt to recruit people for a company in New Orleans where he did "odd jobs." He explained that he never paid anyone to work, the post is only phrased in this manner because it is the "way [he] talks" and that he was only trying to recruit workers.

With respect to the January 21, 2021, and August 9, 2021, posts, Johnson testified that the January post only meant that he was permitted to recruit players again. In addressing the August post, Johnson stated that he was a sports marketing agent and recruited Williamson. He stated that at one point, he got Williamson to sign an $80,000,000 deal with Michael Jordan because he was "in the industry pretty huge" at that time, but his lawsuit with Williamson was not settled and that he was under a "gag order."

The State then introduced a document with the following caption: "[a] lawsuit filed by Cedriquze Johnson versus Zion Williamson's former marketing agent, has settled. June the 2nd, a mediator's report said they're at a full settlement. No additional details. Johnson was arguing a five percent cut of former marketing agents' commission for recruiting Zion." Johnson stated that despite this, the lawsuit was not settled because it was filed in two states, and a decision had not been rendered in one state.

During questioning by the trial court, Johnson clarified that despite statements during the initial hearing that he purchased homes, he never "flipped" homes, rather, he stated he purchased a home for Adams. Johnson stated generally that he could not afford to pay the modified support payments, and that he was actively involved in C.J.'s life. The State called Adams, who testified that C.J. has a close relationship with Johnson. She stated that Johnson never purchased a home for her and that while Johnson's name is on the deed, her name is on the mortgage. She stated that Johnson paid two notes, but she primarily pays the mortgage. Adams testified that Johnson did some repairs on the home, but stated that they were small. Adams admitted that Johnson occasionally helped with her other children but maintained that only she provided financial support for them.[12]

In discussing why the hearing officer imputed $100,000 as Johnson's annual income, the State explained that it was difficult to determine Johnson's actual income and as a result, the hearing officer considered Johnson's bank accounts with Hancock Whitney[13] and used the Louisiana Occupational Wage Guide ("LOWG") to determine the average income for coaches and scouts in Louisiana, which was $58,890. However, given Johnson's various trips to sporting events and his "extravagant lifestyle," the hearing officer found this amount to be "grossly low."

---

[12] Adams also testified that sometime in 2019, Johnson adopted a basketball player from Africa, who is currently attending college in a different state, but was the number one basketball player in Africa prior to his adoption.

[13] The State noted that Johnson's business account, CED Johnson, LLC, initially contained $6,956, but as of the date of the hearing, was -$159. Although questioned why the account was in the negative, Johnson only stated that he could not touch the money in the account and that he needed the signature of both of his business partners to do so.

In reviewing the hearing officer's obligation worksheet, the trial court noted two occupations were listed for Johnson: producers and directors (with an average income of $45,720), and coaches and scouts (with an average income of $58,890). The State then noted that Johnson failed to produce his tax returns from the past three years since the rule for support was filed on January 20, 2021. At that time, the trial court permitted Johnson to produce his tax returns on his phone, wherein the 2018 return reflected a gross income of $145,362; however, the State indicated that the 2019 return was not signed by a certified tax preparer, and the 2020 return provided that Johnson did not have a reported income, but did have expenses of $20,000.[14]

At the close of testimony, the trial court issued its ruling, finding that Johnson was not credible with respect to his income and earnings. In considering the hearing officer's determination that the average income for Johnson's area of work, in total, yielded an average income of $100,000 and that Johnson's 2018 tax return reflected that his gross income was $145,362, the trial court determined that the $100,000 imputed to Johnson's income was not improper, given that there were no other supporting documents to verify Johnson's actual income. Johnson now appeals this ruling, raising two assignments of error.

**DISCUSSION**

*Imputation of Income*

By his first assignment, Johnson alleges that the trial court erred in imputing an income earning potential of $100,000. Johnson acknowledges

---

[14] In explaining the reported expenses, the State provided that at that time, it appeared that Johnson received money through the Paycheck Protection Program, which would allow him not to report the money as income, but report it as an expense instead.

9

that the trial court may consider the most recently published LOWG to determine the income earning potential of a party found to be voluntarily unemployed or underemployed; however, he argues that in this case, the trial court improperly utilized the LOWG in assigning him two separate occupations, producers and directors (with an average income of $45,720), and coaches and scouts (with an average income of $58,890), and merely adding the salaries to arrive at an annual income estimation. Johnson maintains that he has never worked as a producer or director and that there is insufficient evidence to establish that this was ever his field of work, or that he possesses the skills or experience sufficient for this occupation.

The law regarding child support payments is well settled: the obligation to support children is a conjoint obligation upon the parents, and each must contribute in proportion to his or her resources. *State ex rel. Douglas v. Williams*, 46,520 (La. App. 2 Cir. 10/05/11), 76 So. 3d 103. If a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of his or her income earning potential, unless the party is physically or mentally incapacitated, or is caring for a child of the parties under the age of five years. In determining the party's income earning potential, the trial court may consider the most recently published Louisiana Occupational Employment Wage Survey. La. R.S. 9:315.11(A). Income includes potential income, if a party is voluntarily unemployed or underemployed. La. R.S. 9:315(C)(5)(b); *Brossett v. Brossett*, 49,883 (La. App. 2 Cir. 6/24/15), 195 So. 3d 471; *Fuqua v. Fuqua*, 45,555 (La. App. 2 Cir. 9/22/10), 47 So. 3d 1121.

A party is not deemed voluntarily unemployed or underemployed if he or she is absolutely unemployable or incapable of being employed, or if the

unemployment or underemployment results through no fault or neglect of the party. *Fuqua, supra.* Voluntary underemployment is a question of good faith of the obligor parent. *Id.* Whether the obligor is in good faith in reducing his or her income is a factual determination which will not be disturbed on appeal absent an abuse of the trial court's wide discretion. *Id.* The trial court also has wide discretion in resolving factual issues. *Id.* The court's credibility determinations regarding a party's sources of income are entitled to great weight. *Armstrong v. Rayford,* 39,653 (La. App. 2 Cir. 05/11/05), 902 So. 2d 1214.

In the instant case, the trial court could not accurately determine Johnson's true income as he claimed to be unemployed, but later contradicted himself and testified to having a part-time job at a bingo hall and "hustling" to pay bills. The trial court then determined that Johnson was voluntarily underemployed and calculated child support payments based on his income earning potential. Using the LOWG, the trial court determined that Johnson fell within two categories: coaches and scouts, as well as producers and directors. Regarding the first category, there is ample testimony and evidence to support the court's finding that Johnson was employed as a recruiter, primarily scouting players for the NBA. Therefore, the only question before this Court is whether there was sufficient evidence to assign the additional occupation of producers and directors to Johnson.

After reviewing the record, we cannot say that the trial court properly assigned this additional occupation. As defined by the LOWG, producers and directors are persons who "[p]roduce or direct stage, television, radio, video, or film productions for entertainment, information, or instruction. [Are] [r]esponsible for creative decisions, such as interpretation of script,

11

choice of actors or guests, set design, sound, special effects, and choreography." The State argues that the trial court only made a "passing reference" to this category to merely suggest "that it might be the closest thing to [Johnson's] described roles as [sic] a promoter and 'hustler.'" However, we cannot say that Johnson's purported business activities fall under this category's definition.

In this case, Johnson primarily testified that he worked as a Sports Marketing Agent, which, from his limited and evasive testimony, appears to include scouting and recruiting potential athletes, facilitating endorsements, and promoting particular athletes. Specifically, he testified that his job entailed "[r]ecruiting the best players all over the world signing marketing bills -- sports marketing bills, like shoe deals, Nike deals, Puma deals, Gatorade, Powerade, stuff like that." We find that such undertakings do not surmount to the type activities associated with a producer or director, as defined by the LOWG. There is no evidence that once Johnson recruited a player or signed an endorsement, he had any further control in facilitating the details of that particular endorsement or deal.

Although Johnson testified that he owned several businesses, including a hair supply store, a uniform store, and a company referred to as Perfect and Perfection Global Marketing Agency, there is no evidence in the record that he produced or directed any activities in relation to those businesses. Further, with respect to Johnson's various social media posts promoting businesses for other individuals, we find that there is no evidence that Johnson did any more than post about such ventures on his various social media. Simply posting about a business on another's behalf does not equate to the definition of producers or directors. An occupational category

12

cannot simply be assigned to Johnson; there must be an activity that correlates to that occupation.

As such, we must reverse this portion of the trial court's judgment as we find that there was not sufficient evidence to support a finding that Johnson worked as a producer or director.

*Increase in Child Support*

By his second assignment, Johnson argues that the trial court erred in increasing his monthly child support obligation from $190 to $937. He alleges that his circumstances had not changed in that he is still unemployed, "except for the occasional odd job or cash "hustle," and was still hoping to recover his former career as a [sic] sports agent."

An award of child support may be modified if the circumstances of the child or of either parent materially change and shall be terminated upon proof that it has become unnecessary. La. C.C. art. 142. The party seeking a reduction in child support must show a material change in circumstances of one of the parties between the time of the previous award and the time of the motion for modification of the award. La. C.C. art. 142; La. R.S. 9:311.

In this case, the trial court expressly found that Johnson was not credible with respect to his employment, income, and lifestyle, and determined that, given his recent activities, the increase in support was warranted. We agree. Despite Johnson's claims that there has been no material change in circumstances, we find that his lifestyle and activities indicate that he continues to live a lavish lifestyle and that he is working as a recruiter and scout again, and has some source of income.

First, Johnson testified that he was unemployed but later stated he had a part-time job working in a bingo hall, earning approximately $10 an hour.

Johnson testified that since his lawsuit with Williamson and the pandemic, he struggled to work as a recruiter and his income declined since 2019. However, we note that Johnson testified that he attended the aforementioned LSU and Southern basketball games for personal entertainment, but later stated that if he noticed a potential client, he would have pursued it, indicating that he has continued to perform his duties in relation to his field of work as a recruiter and scout despite testimony that his lawsuit with Williamson prevented him from working as a scout.

Specifically, he stated, "[a]nytime I go to a game, it could be through work, you know. So, if I go to a high school game and I see a player, I'm going to try and talk to the parents or something like that or do something to try to, you know, get some kind of lead way and try to make it happen. . ." Moreover, Johnson testified that only a few days before the rehearing, he was called to California to recruit and scout a potential player. Regardless of whether Johnson was able to successfully recruit a potential athlete does not diminish the fact that he still performs his duties as a scout or recruiter.

Importantly, the only evidence that Johnson has produced to indicate that there has been no change in his circumstances is his 2020 tax return which reflected that he did not have an income for that tax year.

However, we note that since then, his lifestyle has vastly contradicted his narrative of being unemployed and having no steady source of income. Throughout the rehearing, the State produced evidence of Johnson attending several sporting events, including Saints games and a video of Johnson with floor seats to a Lakers and Clippers game. It is evident that Johnson has attempted to mask his lavish expenditures by claiming his outings as gifts. The record in this case reflects that Johnson continues to own his home in

14

Monroe, is able to pay his utilities, has a part-time job, and continues to attend several sporting events where he continues to exercise his skills as a recruiter and scout.

Although we find that Johnson's income earning potential is more appropriately classified under the coaches and scouts category of the LOWG, we note that the court has discretion in setting the amount of basic child support. The overriding factor in determining the amount of support is the best interest of the children. *Jones v. Jones*, 38,790 (La. App. 2 Cir. 6/25/04), 877 So. 2d 1061. The amount of child support in a specific matter is to be judged on a case-by-case basis; there is no mathematical formula. *Id.* In this case, the increase in support was based on the finding that Johnson's income as a scout alone did not accurately reflect his income from his 2018 tax return, his lifestyle, and all other facts presented at trial.

Because the trial court is afforded discretion in determining support, we find that the court did not err in affirming the increase in child support payments based on the facts presented to the court. This assignment lacks merit.

## CONCLUSION

For the aforementioned reasons, the judgment of the trial court is reversed as to the finding that Johnson's income fell within the producers and directors category under the LOWG. We affirm the remainder of the trial court's judgment regarding monthly child support payments in the amount of $937, plus the additional five percent statutory fee. Costs of this appeal are assessed to Johnson.

**REVERSED IN PART; AFFIRMED IN PART.**

15